**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JANICE KERNS BRICE**<br>4420 Bowen Road, S.E.<br>Washington, DC 20019<br><br>and<br><br>**FRANK KERNS**<br>4420 Bowen Road, S.E.<br>Washington, DC 20019<br><br>               Plaintiffs,<br><br>**v.**<br><br>**L'Oréal USA, Inc.**<br>575 5th Avenue<br>New York, NY 10017<br><br>Serve Registered Agent:<br>      Corporation Service Company<br>      80 State Street<br>      Albany, NY 12207<br><br>**L'Oréal USA Products, Inc.**<br>10 Hudson Yards<br>347 10th Avenue<br>New York, NY 10001<br><br>Serve Registered Agent:<br>      Corporation Service Company<br>      80 State Street<br>      Albany, NY 12207<br><br>**Soft Sheen-Carson LLC**<br>80 State Street<br>Albany, New York 12207<br><br>Serve Registered Agent:<br>      Corporation Service Company,<br>      80 State Street<br>      Albany, New York 12207<br><br>**Strength of Nature, LLC**<br>64 Ross Road | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No.:<br><br><br><br>  **COMPLAINT**<br>  **AND DEMAND**<br>  **FOR JURY TRIAL** |

Savannah, Georgia 31405

Serve Registered Agent:
     Karan Sood
     64 Ross Road
     Savannah, Georgia 31405

**Godrej SON Holdings, Inc.**
64 Ross Road
Savannah, Georgia 31405

Serve Registered Agent:
     Karan Sood
     64 Ross Road
     Savannah, Georgia 31405

**Dabur International USA Ltd.**
310 South Racine Avenue,
Chicago, Illinois 60607

Serve Registered Agent:
     Rakesh Sareen
     27475 Ferry Road
     Suite 129
     Warrenville, Illinois 60555

**Dabur International Ltd.**
5 Independence Way,
Princeton, New Jersey 08540

Serve Registered Agent:
     Rakesh Sareen
     5 Independence Way
     Suite 300
     Princeton, New Jersey 08540

**Namaste Laboratories, L.L.C.**
310 South Racine Avenue
Chicago, Illinois 60607

Serve Registered Agent:
     Illinois Corporation Service Company
     801 Adlai Stevenson Drive
     Springfield, Illinois 62703

**Defendants**

## COMPLAINT

COME NOW Plaintiffs, Janice Kerns Brice and Frank Kerns, by and through their attorneys Karen E. Evans, Esq., David E. Haynes, Esq. and The Cochran Firm, DC and file this Complaint for damages against the Defendants, on the grounds and in the amounts set forth herein:

## NATURE OF THE ACTION

1.      This action is brought by Plaintiff, Janice Kerns Brice, who was injured and suffered losses as a result of her use of Defendants' Products, including, but not limited to, **Just For Me, Olive Oil, Dark & Lovely, and TCB,** (hereinafter collectively referred to as Products) to chemically straighten and/or relax her hair.

2.      This action is also brought by Plaintiff Frank Kerns who suffered loss of consortium damages as a result of Plaintiff Janice Kerns Brice's use of Defendants Products and losses related thereto.

3.      Defendants were responsible for the design, research, manufacture, testing, advertisement, labeling, promotion, marketing, sale, and/or distribution of Defendants' Products.

4.      At all relevant times, Defendants knew or should have known that their Products had not been properly tested and/or were not safe for their indicated use.

5.      Defendants negligently misrepresented and/or fraudulently represented to Plaintiff Janice Brice and/or the public in general that their Products had been tested and were found to be safe for their indicated use despite Defendants' knowledge to the contrary.

6.      Defendants concealed their knowledge of the Products' defects from Plaintiff Janice Brice and/or the public in general.

7.     Defendants' representations and/or omissions were done with the intent of defrauding and deceiving the public in general, including Plaintiff Janice Kerns Brice, and were made with the intent of inducing the public in general to purchase Defendants' Products for chemically straightening and/or relaxing hair, all of which evinced a callous, reckless, willful, depraved indifference to health, safety, and welfare of the Plaintiff, Janice Kerns Brice.

8.     Defendants negligently and improperly failed to perform sufficient tests, if any, on the Products, forcing Plaintiff Janice Kerns Brice to rely on inaccurate safety and risk information relating to the Products.

9.     As a result of the foregoing acts and omissions of Defendants, the Plaintiff was and still is caused to suffer serious and dangerous side effects including, inter alia, uterine cancer requiring chemotherapy, as well as other severe and personal losses including "chemo brain" which are permanent and lasting as well as, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications, fear of recurrent any cancer, metastasis of cancer and death from cancer, and financial losses among other losses and damages.

10.    Plaintiff Janice Kerns Brice has sustained the above health consequences and damages due to her long term and chronic use of Defendants' Products, and Defendants' actions and/or omissions were a direct and proximate cause of her health consequences and damages.

11.    Consequently, Plaintiff Janice Kerns Brice seeks compensatory damages as a result of her use of Defendants' Products, which has caused her to suffer from uterine cancer requiring hysterectomy, as well as "chemo brain" and other severe and personal losses which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or

medications, and fear of cancer recurrence, cancer metastasis, fear of dying from cancer among other health consequences and financial losses and damages.

## PARTIES

12.    Plaintiff, Janice Kerns Brice is a citizen of the United States of America and is a citizen of the District of Columbia.

13.    Plaintiff, JANICE BRICE was born on September 30, 1954.

14.    Plaintiff Janice Kerns Brice and Plaintiff Frank Kerns were married in 1982.

15.    Plaintiff, Janice Kerns Brice, first began using Defendants' Products in the early 1970's as a teenager and used Defendants' Products approximately every  4-6 weeks per year, including up to and through the time of her diagnosis with and treatment for uterine cancer.

16.    Plaintiff Janice Kerns Brice used Defendants' Products by applying them to her hair, exactly as instructed by Defendants.

17.    Plaintiff Janice Kerns Brice would keep the Products on her hair for the time allotted in the instructions.

18.    There was never any indication, on the Products' packaging or otherwise, that this normal and expected use could and would cause her to develop uterine cancer.

19.    As a result of using Defendants' Products, Plaintiff Janice Kerns Brice was caused to suffer from uterine cancer.

20.    On or about October 15, 2020 a biopsy was performed and uterine cancer was discovered which has caused Janice Kerns Brice to undergo chemotherapy and other treatments, sustain severe and permanent personal losses, pain, suffering, and emotional distress. Plaintiff Janice Kerns Brice underwent a hysterectomy on or about November 3, 2020.

21.     Defendants' Products were a proximate cause and contributing factor of the injuries, financial losses, and damages sustained by Plaintiff Janice Kerns Brice.

22.     Plaintiff Frank Kerns is a citizen of the United States of America and is a citizen and resident of the District of Columbia.

23.     Plaintiff Frank Kerns is the lawful spouse of Plaintiff Janice Kerns Brice and was her lawful spouse at all relevant times.

## PARTY DEFENDANTS

24.     Defendant **L'Oréal USA, Inc.** is, and at all times relevant to this action, was a corporation with its principal place of business and headquarters located at 575 5th Avenue, New York, NY 10017 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

25.      Defendant **L'ORÉAL USA PRODUCTS, INC**. is incorporated in Delaware with its principal place of business and headquarters located at 10 Hudson Yards, 347 10th Avenue, New York, New York 10001, and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207.

26.     Defendant **Soft Sheen-Carson LLC** is, and at all times relevant to this action was, a limited liability company organized in the State of New York with its principal place of business and headquarters located at 80 State Street, Albany, New York 12207 and process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, New York 12207. Plaintiff alleges that, at all times relevant to this action, Soft Sheen-Carson LLC's sole member and interested party is and was L'Oréal S.A., which at all times relevant to this action was a French corporation having its headquarters and principal place of business in France. This Court has jurisdiction over Soft Sheen-Carson LLC based on complete diversity of

citizenship between Plaintiff and each member of Soft Sheen-Carson LLC and Defendants collectively.

27.    Defendant **Strength of Nature, LLC** is, and at all times relevant to this action was a limited liability company organized in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon its registered agent, Karan Sood, 64 Ross Road, Savannah, Georgia 31405. Plaintiff alleges that, at all times relevant to this action, Strength of Nature, LLC's sole member and interested party is and was Godrej SON Holdings, Inc., incorporated in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405. Process may be served upon Karan Sood, 64 Ross Road, Savannah, Georgia 31405. This Court has jurisdiction over Strength of Nature, LLC based on complete diversity of citizenship between Plaintiff and each member of Strength of Nature, LLC and Defendants collectively.

28.    Defendant **Godrej SON Holdings, Inc.** is, and at all times relevant to this action was incorporated in the State of Georgia, with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405, and process may be served upon Karan Sood, 64 Ross Road, Savannah, Georgia 31405. Defendant Dabur International USA Ltd. is, and at all times relevant to this action was, a wholly owned subsidiary of Dabur India, Ltd., and at all times relevant to this action was, Dabur India Ltd.'s sole United States distributor, with its principal place of business and headquarters at 310 South Racine Avenue, Chicago, Illinois 60607, and process may be served upon Rakesh Sareen at 27475 Ferry Road, Suite 129, Warrenville, Illinois 60555.

29.    Defendant **Dabur International USA Ltd.** is, and at all times relevant to this action was a wholly owned subsidiary of Dabur India, Ltd., and at all times relevant to this action

was, Dabur India Ltd.'s sole United States distributor, with its principal place of business and headquarters at 310 South Racine Avenue, Chicago, Illinois 60607, and process may be served upon Rakesh Sareen at 27475 Ferry Road, Suite 129, Warrenville, Illinois 60555.

30.     Defendant **Dabur International Ltd.** is, and at all times relevant to this action was incorporated in New Jersey, with its principal place of business and headquarters located at 5 Independence Way, Princeton, New Jersey 08540, and process may be served upon Rakesh Sareen at 5 Independence Way, Suite 300, Princeton, New Jersey 08540.

31.     Defendant **Namaste Laboratories, L.L.C**. is, and at all times relevant to this action was, a limited liability company organized in Illinois with its principal place of business located at 310 South Racine Avenue, Chicago, Illinois 60607, and process may be served upon its registered agent, Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703. Plaintiff alleges in good faith that, at all times relevant to this action, Namaste Laboratories, L.L.C.'s member and sole interested party is, and at all times relevant to this action was, Dermoviva Skin Essentials, Inc., incorporated in Delaware having its headquarters and principal place of business at 310 South Racine Avenue, Chicago, Illinois 60607.

32.     At all pertinent times, the Defendants were engaged in the research, development, manufacture, design, testing, sale, and marketing of the Products, and introduced such products into interstate commerce with knowledge and intent that such products be sold throughout the United States, including the District of Columbia.

33.     At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the

defective Products, including but not limited to **Just For Me, Olive Oil, Dark & Lovely, and TCB**.

34.     These products were all marketed and sold either directly or indirectly, to members of the general public within the District of Columbia, including Plaintiff, Janice Brice.

35.     Defendants' defective hair products were placed into the stream of interstate commerce and was used by the Plaintiff **most of her life**, until and after her diagnosis of uterine cancer in **2020**.

## JURISDICTION AND VENUE

36.     Jurisdiction is vested in this Court pursuant to 28 U.S. Code § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Defendant is a citizen of a state other than the state in which Plaintiff is a citizen.

37.     Venue in this District is proper under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and Plaintiff resides in this District.

38.     This Court has personal jurisdiction over Defendants because Defendants conduct business in the District of Columbia, purposefully direct and/or directed their actions toward the District of Columbia and have the requisite minimum contacts with the District of Columbia necessary to constitutionally permit this Court to exercise jurisdiction. Moreover, Defendants' actions and/or inactions described herein were purposefully directed at and/or within the District of Columbia, the damages were sustained by Plaintiffs within the District of Columbia, the losses and damages sustained by Plaintiffs were a result of Defendants' actions and/or inactions— described herein—that were purposefully directed at and/or within the District of Columbia.

## FACTS COMMON TO ALL COUNTS

Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs of this Complaint, as if each allegation were fully set forth herein, and incorporate each preceding allegation by reference, and further allege as follows:

### A.  Chemical Hair Straighteners and Relaxers

39.     Black people make up approximately 13% of the U.S. population, but by one estimate, African American spending accounts for as much as 22% of the $42 billion-a-year personal care products market, suggesting that they buy and use more of such products – including those with potentially harmful ingredients– than Americans as a whole.[1]

40.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve (12) was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to personal care products. The worst-scoring products marketed to Black women were hair relaxers, hair colors and bleaching products. Each of these categories had an average product score indicating high potential hazard.

41.     In the U.S. alone, Black consumers spend over $1 trillion each year, with a significant amount of that spending toward hair care products.

---

[1] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?*, New America Media, Feb. 2, 2012, americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile*, Dun & Bradstreet First Research, August 2016, www.firstresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (This report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

42.     In 2020, the global Black Hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to $854 million annually by 2028.

**Defendants Marketing Materials**

43.     In 1971, Dark and Lovely manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.

44.     In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking. As a result, Johnson and Johnson marketed the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.

45.     Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas.

46.     Today, Defendants market their hair relaxer products to African American customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendants' marketing scheme relies heavily on branding and slogans that reinforce straight hair as the standard.

47.     Defendant STRENGTH OF NATURE, LLC's Just for Me brand specifically targets young Black girls with promises of "perfect straightness," grooming the next generation of lifetime consumers.

48.     The L'ORÉAL and SOFT SHEEN Defendants depict a Black woman with straight hair on each of their Dark and Lovely and Optimum brands of relaxer product.

**B.  Janice Brice**

49.     At the time of filing this complaint, Janice Brice is a 68 year-old African American female.

50.     She started using hair relaxer products as a teenager. She continued to use hair relaxers 4 or more times a year for more than 30 years.

51.      On or about October 15, 2020, a uterine biopsy was performed and the results revealed that Ms. Brice had uterine cancer.

52.     On or about November 3, 2020, Plaintiff Janice Kerns Brice had a hysterectomy and thereafter began multiple rounds of chemotherapy treatment to treat her uterine cancer diagnosis.

53.     Ms. Brice stopped using Defendants' products during the fall/summer of 2022, when she first heard that hair relaxers caused cancer.

## C. Chemical Relaxers

54.     Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame" their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis.

55.     Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, and beauty supply stores in urban and rural cities throughout the United States.

56.     Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair.

57.     After a period of weeks (4 – 8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "touch-ups" or "re-touches", resulting in women relaxing their new growth every four to eight weeks on average, usually for decades.

58.     Hair relaxers can, and often do, cause burns and lesions in the scalp, facilitating entry of hair relaxer constituents into the body. The frequency of scalp burns with relaxer application has been shown to increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

59.     The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate; and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

60.     Hair products such as relaxers contain hormonally active and carcinogenic compounds, such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories.

61.     In some studies, up to 90% of Black and Brown women have used hair relaxants and straighteners, which is more commonplace for these women than for any other race. Relaxer habits usually begin in formative childhood years, and adolescence is likely a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals.[2]

---

[2] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018).

62.     In the 1990s, the first relaxer product for young Black girls, Just for Me ™, hit the market with a catchy advertising jingle that captured consumer attention.[3] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

63.     Once relaxer use begins in childhood, it usually becomes a lifetime habit, to maintain the straight hair european standard of beauty.

**D. Regulatory Framework**

64.     There are laws and regulations that apply to cosmetics placed into the market. The two most important laws pertaining to cosmetics marketed in the United States are the Federal Food Drug and Cosmetic Act ("FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

65.     The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

66.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging, shipping, or handling.

67.     Under the FD&C Act a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user and 2) if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

68.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

---

[3] Dana Oliver, *The '90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Hea*ds, HuffPost, Feb., 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981

69.     Under the FD&C Act, a cosmetic is misbranded if 1) labeling is false or misleading, 2) the label does not include all required information, 3) required information is not prominent and conspicuous, 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to section 3 and 4 of the Poison Prevention Packaging Act of 1970.[4]

70.     Under the regulations required by the Fair Packaging and Labeling Act (FPLA or Act), all "consumer commodities" must be labeled to disclose net contents, identity of commodity, and name and place of business of the product's manufacturer, packer, or distributor to prevent consumer deception with respect to descriptions of ingredients, among other provisions.

71.     Moreover, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[5] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health, too.[6]

72.     On May 19, 2022, the FDA issued regulations to preclude the use of most previously-authorized phthalates as food additives because these uses have been abandoned by industry.[7] The FDA revoked authorizations for the food contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides.[8]

73.     The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic and (b) performance of any

---

[4] Food and Drug Administration Cosmetic Act § 602 (1938).

[5] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/prohibited-restricted-ingredients-cosmetics
[6] 21 Code of Federal Regulations § 700.19.
[7] § 87 FR 31080
[8] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug Administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

additional toxicological and other tests that are appropriate in light of such existing data and information.[9]

74.    Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products.

75.    Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces.[10]

76.    With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the establishment of warning statements related to cosmetic products. Section 740.1 states that "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product." (emphasis added). This warning directive directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

77.    In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and risks of their products, and to warn consumers anytime a health hazard may be associated with their products.

---

[9] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, U.S. Food and Drug Administration, Mar., 3, 2005,  https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

[10] *Id.*

78.    A wealth of peer-reviewed, scientific information regarding the long-term use and effect of hair relaxers/straighteners and certain chemicals, including endocrine-disrupting chemicals, should have alerted manufacturers of these hair relaxer/straightener products to the specific and dangerous harms associated with their hair relaxer/straightener products when used as intended, and customarily by black and brown women.

### E.  Components of Chemical Hair Straighteners and/or Relaxers

79.    Recent studies investigating the potential link between various adverse health effects in women, including cancer, and the use of chemical hair straighteners and/or relaxers have implicated certain frequent chemical components of chemical hair straighteners as possible contributors to adverse health effects in women, including, but not limited to, increased uterine cancer incidence. These constituents include phthalates, parabens, bisphenol A ("BPA"), cyclosiloxanes, diethanolamine (all of which are considered endocrine disrupting chemicals ("EDCs"), discussed in further detail below), metals, and formaldehyde.[11]

80.    A study examining the chemical components of hair products used by Black women found that hair relaxers marketed for children contained five chemicals that were not generally listed on the product labels and that certain unlisted chemicals, including  phthalate Di-2-ethylhexylphthalate[12] ("DEHP") and BPA were associated with reproductive toxicity and cancer.

---

[11] Chang C-J, et al. *Use of Straighteners and Other Hair Products and Incidence Uterine Cancer*. JNCI J Natl Cancer Inst. 2022:00(0). Available at: https://doi.org/10.1093/jnci/djac165.; White A.J., et al. *Use of hair products in relation to ovarian cancer risk*. Carcinogenesis 2021;42(9):1189-1195. Available at: https://doi.org/10.1093/carcin/bgab056; Coogan P.F., et al. *Hair product use and breast cancer incidence in the Black Women's Health Study*. Carcinogenesis 2021;42(7):924-930. DOI:10.1093/carcin/bgab041; Gaston S.A., et al. *Chemical/Straightening and Other Hair Product Usage during Childhood, Adolescence, and Adulthood among African-American Women: Potential Implications for Health*. J. Expo. Sci. Environ. Epidemiol. 2020;30(1):86-96. doi:10.1038/s41370-019-0186-6; Zota A.R., Shamasunder B. *The environmental injustice of beauty: framing chemical exposures from beauty products as a health disparities concern*. Am. J. Obstet. Oct. 2017;418-422.

[12] Also known as Bis(2-ethylhexyl) phthalate.

Specifically, 84% of the chemicals detected in the study were not listed on the label. This is important because "[m]ixtures of chemicals may act additively through a common biological pathway or affect multiple carcinogenic mechanisms, resulting in a greater effect than each chemical in isolation. Low-dose mixtures of phthalates, parabens…and other common chemicals exhibit additive anti-androgenic activity and additive estrogenic activity."[13]

81.      There is accumulating evidence from experimental and animal studies that parabens and phthalates have carcinogenic potential. Studies have shown higher levels of parabens (in endometrial tissues) and phthalates (in urine) in participants diagnosed with endometrial cancer than those who were cancer-free.[14] Additionally, studies have shown higher urinary levels of certain phthalates and parabens in U.S. Black women compared to U.S. White women.[15] Black individuals in the U.S. have also been found to have higher concentrations of certain parabens than White individuals.[16]

82.      Other studies have indicated a link between altered estrous (reproductive) cycle and uterine pathology with chronic exposure to low-dose BPA, an adverse effect associated with

---

[13] Helm J.S., et al. *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*. Environ. Research 2018;165:448-458.

[14] Sarink D, et al. *BPA, parabens, and phthalates in relation to endometrial cancer risk: a case-control study nested in the multiethnic cohort*. Environ Health Perspect. 2021;129(5):57702.doi:10.1289/EHP8998.; Dogan S, et al. *Traces of intact paraben molecules in endometrial carcinoma*. Environ Sci Pollut Res Int. 2019;26(30):31158-31165. doi: 10.1007/s11356-019-06228-1.

[15] Helm J.S., et al. *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*. Environ. Research 2018;165:448-458; James-Todd T.M., et al. *Racial and ethnic variations in phthalate metabolite concentration changes across full-term pregnancies*. J. Expo. Sci. Environ. Epidemiol. 2017;27:160–166; Varshavsky J.R., et al. *A novel method for calculating potency weighted cumulative phthalates exposure with implications for identifying racial/ethnic disparities among U.S. reproductive-aged women in NHANES 2001-2012*. Environ. Sci. Technol. 2016;50:10616–10624; Nguyen V.K., et al. *A comprehensive analysis of racial disparities in chemical biomarker concentrations in United States women, 1999-2014*. Environ. Int. 2020;137:105496.

[16] US Centers for Disease Control and Prevention. Fourth national report on human exposure to environmental chemicals: updated tables, Volume 1. US Department of Health and Human Services; 2019. Available at: https://stacks.cdc.gov/view/cdc/75822.

endometrial cancer development and progression.[17] Black individuals in the U.S. have also been found to have higher concentrations of BPA than White individuals.[18]

83.    Further, studies have associated cyclosiloxanes with neoplastic responses, which can lead to tumor growth, in the uterus of rats.[19]

84.    Finally, diethanolamine, metals, and formaldehyde have all been considered carcinogenic.[20]

## F.    Endocrine-Disrupting Chemicals

85.    The endocrine system is indispensable for life and influences nearly every cell, organ, and processes within the body.[21] The endocrine system regulates all biological processes in the body from conception through adulthood, including the development of the brain and

---

[17] Leung YK, et al. *Low-dose bisphenol a in a rat model of endometrial cancer: a CLARITY-BPA study*. Environ Health Perspect. 2020;128(12):127005.doi:10.1289/EHP6875; Mallozzi M, et al. *Endocrine disrupting chemicals and endometrial cancer: an overview of recent laboratory evidence and epidemiological studies*. Int J Environ Res Public Health. 2017;14(3): 334.doi:10.3390/ijerph14030334.

[18] US Centers for Disease Control and Prevention. Fourth national report on human exposure to environmental chemicals: updated tables, Volume 1. US Department of Health and Human Services; 2019. Available at: https://stacks.cdc.gov/view/cdc/75822.

[19] Dekant W, et al. *Biological relevance of effects following chronic administration of octamethylcyclotetrasiloxane (D4) in Fischer 344 rats*. Toxicol Lett. 2017;279:42-53. doi:10.1016/j.toxlet.2017.01.010.; Jean PA, et al. *Chronic toxicity and oncogenicity of decamethylcyclopentasiloxane in the Fischer 344 Rat*. Regul Toxicol Pharmacol. 2016; 74:S57-S66. doi:10.1016/j.yrtph.2015.06.014.; Jean PA, Plotzke KP. *Chronic toxicity and oncogenicity of octamethylcyclotetrasiloxane (D4) in the Fischer 344 rat*. Toxicol Lett. 2017;279:75-97. doi:10.1016/j.toxlet.2017.06.003.

[20] Mallozzi M, et al. *Endocrine disrupting chemicals and endometrial cancer: an overview of recent laboratory evidence and epidemiological studies*. Int J Environ Res Public Health. 2017;14(3):334.doi:10.3390/ijerph14030334; International Agency for Research on Cancer (IARC). *Chemical Agents and Related Occupations*. Vol 100F. Lyon, France: IARC Monographs on the Evaluation of Carcinogenic Risks to Humans; 2012.; Aglan MA, Mansour GN. *Hair straightening products and the risk of occupational formaldehyde exposure in hairstylists*. Drug Chem Toxicol. 2020;43(5):488-495. doi:10.1080/01480545.2018.1508215; International Agency for Research on Cancer (IARC). *Arsenic, Metals, Fibres and Dusts*. Vol 100 C. Lyon, France: IARC Working Group on the Evaluation of Carcinogenic Risks to Humans; 2012; International Agency for Research on Cancer (IARC). *Some Chemicals Present in Industrial and Consumer Products, Food and Drinking-Water*. Vol 101. Lyon, France: IARC Monographs on the Evaluation of Carcinogenic Risks to Humans; 2013.

[21] *Endocrine System: The Endocrine System Includes The Thyroid, Adrenals, and the Pituitary Gland*, Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

nervous system, the growth and function of the reproductive system, as well as the metabolism and blood sugar levels.[22]

86.     The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body.[23]

87.     Hormones, such as estrogen, testosterone, progesterone, and androgen, are chemical signals that control or regulate critical biological processes.[24]

88.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs.[25]

89.     The precise functioning of the endocrine system is vital to maintain hormonal homeostasis, the body's natural hormonal production and degradation. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome.[26]

90.     EDCs are chemicals, or chemical mixtures, that interfere with the normal activity of the endocrine system.

91.     EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery.[27]

---

[22]     *Endocrine Disruption*, United States Environmental Protection Agency, Mar., 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-system
[23] *Id*.
[24] *Id*.
[25] Id.
[26]*Id*.; Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification*, Nature Reviews Endocrinol, Nov., 12, 2019, https://www.nature.com/articles/s41574-019-0273-8
[27] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement*, Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844/

92.     EDCs disrupt the endocrine system and interfere with the body's hormonal homeostasis in various ways.

93.     EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

94.     EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

95.     EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors.[28]

96.     EDCs are linked to numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, neurological and learning disabilities.[29] Specifically, EDCs have the potential to cause formation of several hormone-dependent cancers, including ovarian cancers.[30]

97.     Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs, including Di-2-ethylhexylphthalate, may have on the male and female

---

[28] Luis Daniel Martínez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology*, Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

[29] *Endocrine Disrupting Chemicals (EDCs)*, Endocrine Society, Jan., 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs#:~:text=EDCs%20can%20disrupt%20many%20different,%2C%20certain%20cancers%2C%20respiratory%20problems%2C

[30] Lee H. M., et al. *Diverse pathways of epithelial mesenchymal transition related with cancer progression and metastasis and potential effects of endocrine disrupting chemicals on epithelial mesenchymal transition process*. Mol Cell Endocrinol 2017;457:103-113, doi:10.1016/j.mce.2016.12.026.

reproductive systems such as inducing endometriosis, abnormal reproductive tract formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[31]

98.     Black women of reproductive age tend to have higher biomarkers of exposure to EDCs. One study stated: "EDCs are an understudied potential contributor to racial disparities in women's health outcomes despite higher chemical exposures among Black women resulting from historical and contemporary structural oppression."[32]

99.     Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes," and thus enter the body when these products are exogenously applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

### i.  Phthalates

100.     Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids also referred to as "plasticizers" based on their most common uses.

101.     Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

102.     At all relevant times herein, phthalates were used in Defendants' products.

---

[31] Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates*, Dev Reproduction, Mar., 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/.
[32] Wesselink A.K., et al. Urinary concentrations of phenols, parabens, and triclocarban in relation to uterine leiomyomata incidence and growth. Fertility and Sterility 2021;116(6):1590-1600. https://doi.org/10.1016/j.fertnstert.2021.07.003.

103.    Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate skin and hair.[33]

104.    Phthalates are known EDCs which interfere with natural hormone production and degradation and are detrimental to human health.[34]

105.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after product is applied, among other uses.

106.    Phthalates can be found in most products that have contact with plastics during producing, packaging, or delivering. Despite the short half-lives in tissues, chronic exposure to phthalates will adversely influence the endocrine system and functioning of multiple organs, which has negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have established restrictions and regulations on some types of phthalates.[35]

107.    Defendants' products referenced herein contain phthalates, including Di-2-ethylhexylphthalate.

108.    Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

109.    However, the regulations do not require the listing of the individual fragrance or flavor, or their specific ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, a consumer, including the Plaintiff, was not able to determine from the

---

[33] Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates
[34] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/
[35] *Id*.

ingredient declaration on the label if phthalates were present in a fragrance used in the herein referenced hair products used by the Plaintiff and placed into the stream of commerce by Defendants.

### ii. Di-2-ethylhexylphthalate

110.     Di-2-ethylhexylphthalate[36] ("DEHP") is a highly toxic manufactured chemical,[37] classified by the International Agency for Research on Cancer ("IARC") as possibly carcinogenic to humans,[38] that is not found naturally in the environment.[39]

111.     DEHP belongs to the family of chemicals called phthalates[40] and can be found in hair relaxers.[41]

112.     DEHP was first used in 1949 in United States and has been the most abundantly used phthalate derivative in the Twentieth century.[42]

113.     DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches into the environment increasing human exposure.[43]

---

[36] Also known as Bis(2-ethylhexyl) phthalate.
[37] Sai Rowdhwal & Jiaxiang Chen, *Toxic Effects of Di-2-ethylhexyl Phthalate: An Overview*, Biomed Research International,                Feb.,                22,                2018 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to, and%20plastic%20waste%20disposal%20sites.
[38] IARC Monographs – 101: Di(2-Ethylhexyl) Phthalate. Available at: https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono101-006.pdf.
[39] *Toxicological Profile for Di(2-Ethylhexyl) Phthalate (DEHP)*, U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP is listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list "because it can cause cancer and birth defects or other reproductive harm").
[40] *Di(2-ethylhexyl) phthalate (DEHP)*, Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp
[41] Helm J.S., et al. *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*. Environ. Research 2018;165:448-458.
[42] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A*, Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234
[43] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians*, Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

114.    Humans are exposed to DEHP through ingestion, inhalation, and dermal exposure for their lifetimes, including intrauterine life.[44]

115.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3–30 µg/kg/day.[45]

116.    The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerated daily intake (TDI) is 48 µg/kg bodyweight.[46]

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[47]

117.    When DEHP enters the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary

---

[44] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipogenesis in C3H/N Mice*, Environmental Health Perspective, May 15, 2012, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070/

[45] Hannon, Patrick et. al., *Daily Exposure to Di(2-ethylhexyl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositol 3-Kinase Signaling Pathway in Adult Mice*, Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1–11 https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[46] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/.

[47] Aalekhya Reddam & David Volz, *Inhalation of two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk*, Environment International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/S016041202100026X

metabolite, mono-(2-ethylhexyl)phthalate (MEHP), and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl)phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl)phthlate (MEOHP).[48]

118.   DEHP and its metabolites are implicated in reproductive tract abnormalities, including cancer and infertility, as well as potential teratogenic effects.[49] Specifically, DEHP is considered carcinogenic in animals.[50]

119.   Most of the available studies on the health effects of DEHP in laboratory animals used oral administration, with a few inhalation studies and only two dermal exposure studies identified.[51]

120.   The results of the selected animal studies, along with limited human data, suggest potential associations between DEHP exposure and the following health outcomes:

   a.   **Reproductive effects.** Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is

---

[48] Saab, Yolande, et. al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di- and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags*. Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Ishtaf Sheikh, et. at., *Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl)phthalate and its five major metabolites with progesterone receptor*. BMC Structural Biology Volume 16, Suppl 1,  16, Sept., 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono(2-ethyl-5-carboxypentyl)phthalate (5-cx-MEPP) and mono[2-(carboxymethyl)hexyl]phthalate (2-cx-MMHP)).
[49] Richardson, Kadeem et. al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Exposed Mice,* Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/; Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health*, Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/.
[50] Helm J.S., et al. *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*. Environ. Research 2018;165:448-458.
[51] *Chapter 2: Health Effects*, Toxicological profile for Di(2-ethylhexyl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf

susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

b. **Developmental effects.** Epidemiological studies suggest a potential association between reduced AGD and testicular decent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

121.   The global consumption of DEHP was estimated at 3.07 million tons (Global demand for plasticizers continues to rise). The estimated global market of phthalates in 2020 is expected to reach 10 billion USD and would still be widely used in plasticizers.[52]

122.   Human epidemiological studies have shown a significant association between phthalates exposures and adverse reproductive outcomes in both women and men.[53]

123.   Evidence found that DEHP was significantly related to insulin resistance and higher systolic blood pressure and the reproduction system problems, including earlier menopause, low birth weight, pregnancy loss, and preterm birth.[54]

---

[52] *Id*.

[53] *Id*.

[54] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women*, Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w

124.    When it comes to the impacts on children, epidemiological studies about phthalates' toxicity focused on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory symptoms, and neurodevelopment.[55]

125.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[56]    459.80( 1116.10) (1513.20)

### iii.  Parabens

126.    Parabens are used as preservative and antibacterial agents in personal care products, and have estrogenic and anti-androgenic activity.[57]

127.    Hair products used by Black women, including chemical straighteners/relaxers, are more likely to contain parabens, which affect estrogenic pathways.[58]

128.    The prevalence of these compounds in such products is consistent with corresponding higher levels found in biomonitoring samples of Black women as compared with White women.[59] In addition, one study indicated that Black children in the U.S. have five times the urinary paraben levels of White children.[60]

---

[55] *Id*.

[56] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ314/PLAW-110publ314.pdf

[57] Harley KG, et al. *Reducing phthalate, paraben, and phenol exposure from personal care products in adolescent girls: findings from the HERMOSA Intervention Study*. Environ Health Perspect 2016;124:1600–1607; http://dx.doi.org/10.1289/ehp.1510514.

[58] Zota A.R., et al. *The environmental injustice of beauty: framing chemical exposures from beauty products as a health disparities concern*. Am. J. Obest. & Gyn. Oct. 2017.

[59] Helm J.S., et al. *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*. Environ. Research 2018;165:448-458.

[60] Calafat A.M., et al. *Urinary concentrations of four parabens in the U.S. population: NHANES 2005–2006*. Environ Health Perspect. 2010;118:679–685. [PubMed: 20056562].

129.    Parabens have been associated with, premature puberty, and endocrine disruption.[61]

130.    In one study, parabens were found in breast tumor tissue at levels similar to those shown to induce uterine growth in rodents.[62]

### iv.  Formaldehyde

131.    Formaldehyde is a naturally occurring, organic, reactive, volatile, colorless gas detectable in air, drinking water, and foods.[63]

132.    Formaldehyde has been classified as a known human carcinogen by both the U.S. Department of Health and Human Services' National Toxicology Program ("NTP") and the International Agency for Research on Cancer ("IARC").[64]

133.    Specifically, in 2005, IARC published its conclusions regarding formaldehyde: "After a thorough discussion of the epidemiologic, experimental, and other relevant data, the working group concluded that formaldehyde is carcinogenic to humans, based on sufficient evidence in humans and in experimental animals."[65]

134.    Formaldehyde is a common ingredient in chemical hair straighteners, even in those labeled as "formaldehyde-free," released into the air when the product is heated during application.[66]

### G.  Uterine Cancer

---

[61] Helm J.S., et al. *Measurement of endocrine disrupting and asthma-associated chemicals in hair products used by Black women*. Environ. Research 2018;165:448-458.

[62] Myers S.L., et al. *Estrogenic and anti-estrogenic activity of off-the-shelf hair and skin care products*. J. Expo. Sci. Environ. Epidemiol. 2015;25(3):271-277. doi:10.1038/jes.2014.32.

[63] Pierce J.S., et al. *Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products*. J. Occ. and Environ. Hygiene 2011;8:686-699.

[64] *Id*.

[65] Cogliano V.J., et al. *Meeting Report: Summary of* IARC Monographs *on Formaldehyde, 2-Butoxyethanol, and 1-* tert-*Butoxy-2Propanol*. Environ. Health Perspect. 2005;113:1205–1208. doi:10.1289/ehp.7542 available via http://dx.doi.org/

[66] Pierce J.S., et al. *Characterization of Formaldehyde Exposure Resulting from the Use of Four Professional Hair Straightening Products*. J. Occ. and Environ. Hygiene 2011;8:686-699.

135.    Uterine cancer is associated with phthalate metabolites found in hair care products.

136.    Uterine cancer[67] accounts for approximately 3% of all new cancer cases.[68]

137.    There are an estimated almost 66,000 new cases of uterine cancer in 2022 in the USA alone, out of which more than 90% is of endometrial origin. It is commonly diagnosed in the seventh decade, with the median age being 63 years.[69]

138.    In addition, Black women with uterine cancer carry a poorer prognosis as compared to White women.[70]

139.    Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[71]

140.    Indeed, new cases of uterine cancer have increased by 0.6% per year from 2010 to 2019, and death rates have risen an average of 1.6% per year over 2011 to 2020.[72]

141.    One study conducted by the National Cancer Institute (NCI) found that uterine cancer incidence rates increased by about 1% per year from 2003 to 2015, with a more rapid increase among women of other racial/ethnic groups than among White women. Uterine cancer incidence rates for Black women in particular have been higher than that of White women since 2007, and were consistently higher from 2011 through 2015.[73]

---

[67] Uterine cancer includes endometrial carcinoma as well as uterine sarcoma, among other less common types.

[68] *Cancer Stat Facts: Uterine Cancer*, National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html

[69] *Id.*; *Key Statistics for Endometrial Cancer*, American Cancer Society, https://www.cancer.org/cancer/endometrial-cancer/about/key-statistics.html.

[70] Joel Sorosky, *Endometrial Cancer*, Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22825101/

[71] *Id.*

[72] Jack J. Lee, *Rising Endometrial Cancer Rate Spur New Approaches to Prevention*, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer

[73] Clarke M.A., et al. *Hysterectomy-Corrected Uterine Corpus Cancer Incidence Trends and Differences in Relative Survival Reveal Racial Disparities and Rising Rates of Nonendometrioid Cancers*. J. Clin. Oncol. 2019;37:1895-1908.

142.    Recent findings from the Sister Study – a large, diverse, ongoing prospective cohort study conducted by the National Institute of Environmental Health Sciences (NIEHS), one of the National Institutes of Health (NIH), to investigate risk factors for breast cancer and other health conditions – show that women who used chemical hair straighteners and/or relaxers had a higher risk of uterine cancer[74] than those who did not. Importantly, the researchers found no such association with other hair products used by those women, including hair dye, bleach, highlights, or perms.[75]

143.    The NIEHS study followed 33,947 US women aged 35-74 for almost 11 years. During follow-up, there were 378 cases of uterine cancer, 262 of which were confirmed through medical records and used for the analysis. The researchers concluded that women who reported frequent use of hair straightening products (i.e., more than four times in the previous year) were more than twice as likely to develop uterine cancer compared to those who did not use the products.[76]

144.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of 70; but for frequent users, that risk more than doubles, increasing to 4.05%.[77]

145.    Approximately 60% of the women in the NIEHS study who used straighteners/relaxers identified as Black women. While the study did not show a difference in uterine cancer incidence based on race, the researchers stated that Black women may experience

---

[74] Uterine cancer cases were defined as women who reported a diagnosis of endometrial cancer, uterine sarcoma, or other types of cancer in the uterus after enrollment.

[75] Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer*, Journal of the National Cancer Institute, Oct., 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/

[76] *Id*. Specifically, in ever vs. never users the HR = 1.80 [1.12-2.88]; for frequent vs. never users the HR = 2.55 [1.46-4.45]. The researchers estimated that 1.64% of women who did not use the products would develop uterine cancer by age 70, compared to 2.82% of ever users and 4.05% of frequent users.

[77] *Id*.

greater adverse health effects based on higher reported prevalence and frequency of use, younger age of initiating use, and harsher chemicals (i.e., higher concentrations of EDCs and other chemicals being regulated or banned).[78]

146.    These recent findings are consistent with earlier studies showing an increase in hormone-related cancers in women with use of straighteners, including ovarian cancer.[79]

## COUNT I
## AS AGAINST ALL DEFENDANTS
## (NEGLIGENCE)

147.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

148.    At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that their Products were not safe for human use because they caused unreasonably dangerous side effects, including, but not limited to, uterine cancer.

149.    At all relevant times and at the time the Products left the Defendants' control, Defendants knew or should have known that the safety risks of their Products were greater than an ordinary user or consumer, such as Plaintiff Janice Kerns Brice would expect.

150.    At all relevant times and at the time the Products left the Defendants' control, the Products were more dangerous than an ordinary user or consumer, such as Plaintiff Janice Kerns Brice, would expect.

---

[78] *Id.*
[79] Eberle C.E., et al. *Hair dye and chemical straightener use and breast cancer risk in a large US population of black and white women.* Int. J. Cancer. 2020;147:383-391; White A.J., et al. *Use of hair products in relation to ovarian cancer risk.* Carcinogenesis 2021;42(9):1189-1195.

151.   At all relevant times and at the time the Products left the Defendants' control, the Products were unreasonably dangerous in design because there existed a feasible, safer alternative design for the Products that was capable of preventing Plaintiff JANICE BRICE's losses and damages – an alternative design that was and is in the exclusive possession, custody, and control of Defendants.

152.   At all relevant times and at the time the Products left the Defendants' control, the Products were unreasonably dangerous in design because there existed a feasible, safer alternative design for the Products, the utility of which outweighed the utility of the design that was actually used for the Products.

153.   The safer, feasible alternative design for the Products was a hair straightening treatment that did not contain endocrine disrupting chemicals and/or formaldehyde.

154.   Despite the fact that Defendants knew or should have known that the Products caused unreasonably dangerous side effects, Defendants continued to market, manufacture, distribute, and/or sell the Products to consumers, including the Plaintiff JANICE BRICE.

155.   Despite the fact that Defendants knew or should have known that the Products caused unreasonably dangerous side effects, Defendants continued to market, distribute, and/or sell the Products to professional cosmetologists, including Plaintiff JANICE BRICE's professional cosmetologist(s) and to consumers, including Janice Brice.

156.   Defendants knew or should have known that consumers such as the Plaintiff JANICE BRICE would foreseeably suffer injury as a result of their failure to exercise ordinary care, as set forth herein.

157.    At all relevant times, the Products were in an unsafe, defective, and inherently and unreasonably dangerous condition, which was dangerous to users, and in particular, the Plaintiff JANICE BRICE.

158.    At all relevant times, given their increased safety risks, the Products were not fit for the ordinary purpose for which they were intended – chemically straightening and/or relaxing hair.

159.    At all relevant times, given their increased safety risks, the Products did not meet the reasonable expectations of an ordinary consumer, including the Plaintiff JANICE BRICE.

160.    Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of the Products into the stream of commerce, including a duty to assure that the Products would not cause users to suffer unreasonable, dangerous side effects.

161.    Defendants had a duty to warn Plaintiff JANICE BRICE, her professional cosmetologist(s), and/or the general public of all safety risks associated with the Products, including its increased risk of causing uterine cancer.

162.    Defendants had a duty to warn Plaintiff JANICE BRICE, her professional cosmetologist(s), and/or the general public that the Products had not been adequately and/or sufficiently tested regarding their safety.

163.    Defendants had a duty to adequately and sufficiently test the Products.

164.    Defendants had a duty to design the Products in a manner that was safe for their users.

165.    Defendants breached their duties to Plaintiff JANICE BRICE by failing to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying,

promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of the Products into interstate commerce in that Defendants knew or should have known that using the Products created a high risk of unreasonable, dangerous side effects, including uterine cancer requiring a hysterectomy, as well as other severe and personal losses which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of redeveloping uterine cancer that may require further surgical intervention.

166.   The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a.   Promoting, formulating, creating, and/or designing the Products without thoroughly testing them;

   b.   Promoting, formulating, creating, and/or designing the Products without adequately testing them;

   c.   Not conducting sufficient testing to determine whether the Products were safe for use in that Defendants herein knew or should have known that the Products were unsafe and unfit for use by reason of the dangers to their users;

   d.   Promoting, marketing, and/or selling the Products without making proper and sufficient tests to determine the dangers to their users;

   e.   Negligently failing to adequately and correctly warn the Plaintiff, her professional cosmetologist(s), and/or the public generally of the dangers of the Products, particularly their increased risk of causing uterine cancer;

   f.   Failing to provide adequate instructions to Plaintiff and/or her professional cosmetologist(s) regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, the Products;

   g.   Failing to test the Products and/or failing to adequately, sufficiently, and properly test the Products;

   h.   Negligently advertising and recommending the use of the Products without sufficient knowledge as to their dangerous propensities;

i.  Negligently representing that the Products were safe for use for their intended purpose, when, in fact, they were unsafe;

j.  Negligently representing that the benefits of the Products outweigh their risks;

k.  Negligently designing the Products in a manner which was dangerous to their users;

l.  Concealing information concerning warnings from the Plaintiff and/or her professional cosmetologist(s) in knowing that the Products were unsafe, dangerous, and/or non-conforming with relevant regulations; and

m.  Improperly concealing and/or misrepresenting information from the Plaintiff, her professional cosmetologist(s), and/or the public generally, concerning the severity of risks and dangers of the Products.

167.  Defendants under-reported, underestimated and downplayed the serious dangers of the Products.

168.  Defendants were negligent in the designing, researching, supplying, promoting, packaging, distributing, testing, advertising, warning, marketing, and sale of the Products in that they:

a.  Failed to use due care in designing the Products so as to avoid the aforementioned risks to individuals when the Products were used for straightening/relaxing hair;

b.  Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects and risks associated with the use of the Products;

c.  Failed to warn Plaintiff and/or her professional cosmetologist(s) of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

d.  Failed to conduct adequate testing to determine the safety of the Products and particularly their propensity to cause uterine cancer;

e.  Failed to warning Plaintiff and/or the public generally, prior to actively encouraging the sale of the Products, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects; and

f.   Were otherwise negligent.

169.   The packaging and/or labeling for the Products were inadequate because they did not warn of the increased risk of uterine cancer associated with the Products.

170.   The packaging and/or labeling for the Products were inadequate because they did not warn that the Products had not been adequately and/or sufficiently tested for safety.

171.   Communications made by Defendants to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) were inadequate because Defendants failed to warn of the increased risk of uterine cancer associated with the Products and/or that the Products had not been adequately and/or sufficiently tested for safety.

172.   Had Plaintiff's professional cosmetologist(s) been warned of the increased risk of uterine cancer associated with the Products they would not have used the Products and/or would have provided Plaintiff with adequate warnings regarding the dangers of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

173.   Had Plaintiff's professional cosmetologist(s) been warned that the Products had not been sufficiently and/or adequately tested for safety, they would not have used the Products and/or would have provided Plaintiff with adequate warnings regarding the inadequate and/or inappropriate testing of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

174.   Had Plaintiff been warned of the increased risk of uterine cancer associated with the Products, she would not have used the Products and/or suffered uterine cancer requiring a hysterectomy.

175. Had Plaintiff been warned of the inadequate and/or inappropriate testing of the Products, she would not have used the Products and/or suffered uterine cancer requiring a hysterectomy.

176. Defendants' negligence in failing to warn Plaintiff and/or her professional cosmetologist(s) of the dangers associated with their Products was the contributing and/or proximate cause of Plaintiff's losses, harm, financial losses, and economic loss which Plaintiff suffered and/or will continue to suffer.

177. Defendants' negligence in failing to sufficiently and/or adequately test the Products was the contributing and/or proximate cause of Plaintiff's losses, harm, and economic loss which Plaintiff suffered and/or will continue to suffer.

178. Defendants' negligence in defectively designing the Products was the contributing and/or proximate cause of Plaintiff's losses, harm, and economic loss which Plaintiff suffered and/or will continue to suffer.

179. Plaintiff JANICE BRICE's losses and damages arose from a customary, usual, reasonably foreseeable use of the Products by Plaintiff JANICE BRICE.

180. Plaintiff JANICE BRICE's losses and damages as a result of her use of the Products were foreseeable by Defendants.

181. As a result of the foregoing negligent acts and omissions, the Plaintiff JANICE BRICE was caused to suffer serious and dangerous side effects including uterine cancer requiring a hysterectomy, as well as other severe and personal losses which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, fear of

redeveloping uterine cancer that may require further surgical intervention and financial losses and damages.

182.    As a result of the foregoing negligent acts and omissions Plaintiff JANICE BRICE requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff JANICE BRICE is informed and believes and further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

183.    By reason of the foregoing, Plaintiff JANICE BRICE has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**COUNT II**
**AS AGAINST ALL DEFENDANTS**
**(STRICT PRODUCTS LIABILITY –**
**DEFECTIVE DESIGN AND FAILURE TO WARN)**

184.    Plaintiffs repeat, reiterate, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

185.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the Products as hereinabove described that was used by the Plaintiff JANICE BRICE.

186.    That the Products were expected to and did reach the usual consumers, handlers, and persons coming into contact with said Product without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by the Defendants.

187.     At those times, the Products were in an unsafe, defective, and inherently

dangerous condition, which was dangerous to users, and in particular, the Plaintiff JANICE

BRICE.

188.     At those times, given their increased safety risks, the Products were not fit for the

ordinary purpose for which they were intended – chemically straightening and/or relaxing hair.

189.     At those times, given their increased safety risks, the Products did not meet the

reasonable expectations of an ordinary consumer, particularly, the Plaintiff JANICE BRICE.

190.     The Products designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants were defective in design or formulation in that,

when they left the hands of the manufacturer and/or suppliers, the foreseeable risks of uterine

cancer exceeded the benefits associated with the design or formulation of the Products.

191.     The Products designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants were defective in design and/or formulation, in

that, when they left the hands of the Defendants manufacturers and/or suppliers, they were

unreasonably dangerous, and were more dangerous than an ordinary consumer would expect.

192.     The Products designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants were defective in design and/or formulation, in

that, when they left the hands of the Defendants manufacturers and/or suppliers, Defendants

knew or should have known that the design of the Products posed a substantial likelihood of

harm (e.g., uterine cancer) to Plaintiff and other users of the Products.

193.     The Products designed, researched, manufactured, tested, advertised, promoted,

marketed, sold, and distributed by Defendants were defective in design and/or formulation, in

that, when they left the hands of the Defendant manufacturers and/or suppliers, a safer feasible

alternative design existed that was capable of preventing Plaintiff JANICE BRICE's injuries, losses and damages – an alternative design that was and is in the exclusive possession, custody, and control of Defendants.

194.    At all relevant times and at the time the Products left the Defendants' control, the Products were unreasonably dangerous in design because there existed a feasible, safer alternative design for the Products, the utility of which outweighed the utility of the design that was actually being used for the Products.

195.    The safer, feasible, alternative design for the Products was a hair straightening treatment that did not contain endocrine disrupting chemicals and/or formaldehyde.

196.    At all times herein mentioned, the Products were in a defective condition and unsafe, and Defendants knew or had reason to know that said Products were defective and unsafe, especially when used in the form and manner as provided by the Defendants.

197.    Defendants knew, or should have known, that at all times herein mentioned their Products were in a defective condition and were and are inherently dangerous and unsafe.

198.    At the time of the Plaintiff JANICE BRICE's use of the Products, the Products were being used for the purposes and in a manner normally intended, namely for straightening/relaxing hair.

199.    Defendants with this knowledge voluntarily designed their Products in a dangerous condition for use by the public, and in particular the Plaintiff JANICE BRICE.

200.    Defendants had a duty to create Products that were not unreasonably dangerous for their normal, intended use.

201.    Defendants breached this duty by creating Products unreasonably dangerous for their normal, intended use.

202.     The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached Plaintiff JANICE BRICE in the same defective and unreasonably dangerous condition in which the Defendants' Products were designed.

203.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed defective Products which created an unreasonable risk to the health of consumers and to the Plaintiff JANICE BRICE, in particular, and Defendants are therefore strictly liable for the losses sustained by the Plaintiff JANICE BRICE.

204.     The Plaintiff JANICE BRICE and/or her professional cosmetologist(s) could not, by the exercise of reasonable care, have discovered the Products' defects herein mentioned and perceived their danger.

205.     The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings or instructions as the Defendants knew or should have known that the Products created a risk of serious and dangerous side effects including uterine cancer, as well as other severe and personal losses which are permanent and lasting in nature and the Defendants failed to adequately warn of said risks.

206.     The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings and/or inadequate testing.

207.     The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks

of serious side effects including uterine cancer, as well as other severe and permanent health consequences from the Products, they failed to provide adequate warnings to users of the Products, and continued to improperly advertise, market and/or promote their Products.

208.   The Products designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings, inadequate testing and/or inadequate post-marketing surveillance, in that, when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous, and more dangerous than an ordinary consumer would expect.

209.   The packaging and/or labeling for the Products were inadequate because they did not warn and/or adequately warn of the increased risk of uterine cancer associated with the Products.

210.   The packaging and/or labeling for the Products were inadequate because they did not warn and/or adequately warn that the Products had not been sufficiently and/or adequately tested for safety risks, including uterine cancer.

211.   Communications made by Defendants to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) were inadequate because Defendants failed to warn and/or adequately warn them of the increased risk of uterine cancer associated with the Products.

212.   Communications made by Defendants to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) were inadequate because Defendants failed to warn and/or adequately warn them that the Products had not been sufficiently and/or adequately tested for safety risks, including the risk of uterine cancer.

213.   Had Plaintiff's professional cosmetologist(s) been warned of the increased risk of uterine cancer associated with the Products, they would not have used the Products and/or would

have provided Plaintiff with adequate warnings regarding the dangers of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

214.    Had Plaintiff's professional cosmetologist(s) been warned that the Products had not been sufficiently and/or adequately tested for safety risks, including the risk of uterine cancer.

215.    In the early 1970's, Plaintiff JANICE BRICE began using the Products for chemically straightening/relaxing her hair.

216.    Beginning early 1970's, Plaintiff JANICE BRICE purchased for use and/or her professional cosmetologist(s) applied the Products believing they were safe and effective for their intended use – chemically straightening/relaxing hair.

217.    Plaintiff JANICE BRICE and/or her professional cosmetologist(s) obtained the information regarding the side effects of the Products from direct-to-consumer marketing, advertising, and/or the packaging and/or labeling of the Products.

218.    In or about theearly1970's, when Plaintiff JANICE BRICE began using the Products and throughout her use of the Products, Defendants expressly warranted to her and/or her professional cosmetologist(s), by way of direct-to-consumer marketing, advertising, and/or the Products' packaging and/or labeling, that the Products were safe and effective to use for chemically straightening/relaxing hair.

219.    As a result of Defendants' express warranties to her, Plaintiff JANICE BRICE and/or her professional cosmetologist(s) were induced to use the Products from the early 1970's through 2014/2015.

220.    At all relevant times, Defendants reasonably anticipated and expected that individuals, such as the Plaintiff JANICE BRICE, would use the Products based upon their express warranties.

221.    At all relevant times, Defendants reasonably anticipated and expected that professional cosmetologist(s), such as Plaintiff JANICE BRICE's professional cosmetologist(s), would recommend and/or apply the Products based upon their express warranties.

222.    At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because of their increased risk of uterine cancer, especially when the Products were used in the form and manner as provided by Defendants.

223.    At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because their safety risks outweighed any cosmetic benefit they may have.

224.    At all relevant times, Defendants knew or should have known that the Products had not been sufficiently and/or adequately tested for safety.

225.    The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by the ordinary user such as Plaintiff JANICE BRICE, with the ordinary knowledge common to the community as to the Products' characteristics.

226.    The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by Plaintiff JANICE BRICE's professional cosmetologist(s), with the ordinary knowledge common to the community as to the Products' characteristics.

227.    At the time the Products left the Defendants' control, the Products did not conform to Defendants' express warranties, because the Products were not safe to use to chemically straighten/relax hair.

228.     At the time the Products left the Defendants' control, the Products did not conform to Defendants' express warranties because the cosmetic benefit of the Products does not outweigh any of the dangers and/or risks associated with them.

229.     The express warranties made by Defendants regarding the safety of the Products were made with the intent to induce Plaintiff JANICE BRICE to use the Products and/or her professional cosmetologist(s) to use/apply the Product.

230.     Defendants knew and/or should have known that by making the express warranties to Plaintiff JANICE BRICE and/or her professional cosmetologist(s), it would be the natural tendency of Plaintiff to use the Products and/or her professional cosmetologist(s) to use/apply the Products.

231.     Plaintiff JANICE BRICE and her professional cosmetologist(s), as well as members of the general public, relied on the express warranties of the Defendants herein.

232.     The express warranties made by Defendants regarding the safety of the Products induced Plaintiff JANICE BRICE to use the Products and/or her professional cosmetologist(s) to use/apply the Products.

233.     Had Defendants not made these express warranties, Plaintiff JANICE BRICE would not have used the Products and/or, her professional cosmetologist(s) would not have used/applied the Products.

234.     Plaintiff JANICE BRICE's losses and damages were directly caused by Defendants' breach of the aforementioned express warranties.

235.     Plaintiff JANICE BRICE's losses and damages arose from a reasonably anticipated use of the product by Plaintiff JANICE BRICE.

236.    Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff JANICE BRICE.

237.    As a result of the foregoing breaches, Plaintiff JANICE BRICE was caused to suffer serious and dangerous side effects including uterine cancer requiring a hysterectomy, as well as other severe and personal losses which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, fear of redeveloping uterine cancer that may require further surgical intervention, losses and damages.

238.    By reason of the foregoing, Plaintiff JANICE BRICE has been severely and permanently injured, and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Products.

239.    As a result of the foregoing acts and omissions the Plaintiff JANICE BRICE required and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff JANICE BRICE is informed and believes and further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

240.    By reason of the foregoing, Plaintiff JANICE BRICE has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**COUNT III**
**AS AGAINST ALL DEFENDANTS**
**(BREACH OF EXPRESS WARRANTY)**

241.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

242.     At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed and distributed the Products as hereinabove described that were used by Plaintiff JANICE BRICE.

243.     At all relevant times, Defendants reasonably anticipated and expected that individuals such as the Plaintiff JANICE BRICE would use, consume, or be affected by the Products.

244.     At all relevant times, Defendants expressly warranted to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) that the Products were safe to use for chemically straightening/relaxing hair.

245.     At all relevant times, Defendants expressly warranted to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) that the cosmetic benefit of the Products outweighed any potential dangers and/or risks.

246.     At all relevant times, the aforementioned express warranties were made to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling.

247.     In the early 1970's, Plaintiff JANICE BRICE began using the Products for chemically straightening/relaxing her hair.

248.     In the early 1970's, Plaintiff JANICE BRICE purchased for use and/or her professional cosmetologist(s) applied the Products believing they were safe and effective for their intended use – chemically straightening/relaxing hair.

249.     Plaintiff JANICE BRICE and/or her professional cosmetologist(s) obtained the information regarding the side effects of the Products from direct-to-consumer marketing, advertising, and/or the packaging and/or labeling of the Products.

250.     In the early 1970's, when Plaintiff JANICE BRICE began using the Products and throughout her use of the Products, Defendants expressly warranted to her and/or her professional cosmetologist(s), by way of direct-to-consumer marketing, advertising, and/or the Products' packaging and/or labeling, that the Products were safe and effective to use for chemically straightening/relaxing hair.

251.     As a result of Defendants' express warranties to her, Plaintiff JANICE BRICE and/or her professional cosmetologist(s) were induced to use the Products from the early 1970's through 2014/2015.

252.     At all relevant times, Defendants reasonably anticipated and expected that individuals, such as the Plaintiff JANICE BRICE, would use the Products based upon their express warranties.

253.     At all relevant times, Defendants reasonably anticipated and expected that professional cosmetologist(s), such as Plaintiff JANICE BRICE's professional cosmetologist(s), would recommend and/or apply the Products based upon their express warranties.

254.     At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because of their increased risk of uterine cancer, especially when the Products were used in the form and manner as provided by Defendants.

255.     At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because their safety risks outweighed any cosmetic benefit they may have.

256.    At all relevant times, Defendants knew or should have known that the Products had not been sufficiently and/or adequately tested for safety.

257.    The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by the ordinary user such as Plaintiff JANICE BRICE, with the ordinary knowledge common to the community as to the Products' characteristics.

258.    The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by Plaintiff JANICE BRICE's professional cosmetologist(s), with the ordinary knowledge common to the community as to the Products' characteristics.

259.    At the time the Products left the Defendants' control, the Products did not conform to Defendants' express warranties because the Products were not safe to use to chemically straighten/relax hair.

260.    At the time the Products left the Defendants' control, the Products did not conform to Defendants' express warranties because the cosmetic benefit of the Products does not outweigh any of the dangers and/or risks associated with them.

261.    The express warranties made by Defendants regarding the safety of the Products were made with the intent to induce Plaintiff JANICE BRICE to use the Products and/or her professional cosmetologist(s) to use/apply the Product.

262.    Defendants knew and/or should have known that by making the express warranties to Plaintiff JANICE BRICE and/or her professional cosmetologist(s), it would be the natural tendency of Plaintiff to use the Products and/or her professional cosmetologist(s) to use/apply the Products.

263.    Plaintiff JANICE BRICE and her professional cosmetologist(s), as well as members of the general public, relied on the express warranties of the Defendants herein.

264.     The express warranties made by Defendants regarding the safety of the Products induced Plaintiff JANICE BRICE to use the Products and/or her professional cosmetologist(s) to use/apply the Products.

265.     Had Defendants not made these express warranties, Plaintiff JANICE BRICE would not have used the Products and/or, her professional cosmetologist(s) would not have used/applied the Products.

266.     Plaintiff JANICE BRICE's losses and damages were directly caused by Defendants' breach of the aforementioned express warranties.

267.     Plaintiff JANICE BRICE's losses and damages arose from a reasonably anticipated use of the product by Plaintiff JANICE BRICE.

268.     Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff JANICE BRICE.

269.     As a result of the foregoing breaches, Plaintiff JANICE BRICE was caused to suffer serious and dangerous side effects including uterine cancer requiring a hysterectomy, as well as other severe and personal losses which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, fear of redeveloping uterine cancer, losses and damages.

270.     By reason of the foregoing, Plaintiff JANICE BRICE has been severely and permanently injured, and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Products.

271.     As a result of the foregoing acts and omissions the Plaintiff JANICE BRICE required and/or will require more health care and services and did incur medical, health,

incidental, and related expenses. Plaintiff JANICE BRICE is informed and believes and further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

272.    By reason of the foregoing, Plaintiff JANICE BRICE has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

## COUNT IV
## AS AGAINST ALL DEFENDANTS
## (BREACH OF IMPLIED WARRANTIES)

273.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

274.    At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed and distributed the Products as hereinabove described that was used by Plaintiff JANICE BRICE.

275.    At the time Defendants marketed, sold, and distributed the Products for use by Plaintiff JANICE BRICE, Defendants knew of the use for which the Products were intended and impliedly warranted the Products to be of merchantable quality and safe and fit for ordinary use.

276.    At all relevant times, Defendants reasonably anticipated and expected that individuals such as the Plaintiff JANICE BRICE would use or be affected by the Products.

277.    At all relevant times, Defendants reasonably anticipated and expected that professional cosmetologists, such as Plaintiff JANICE BRICE's professional cosmetologist(s), would recommend and/or use/apply the Products for chemically straightening/relaxing hair.

278.   At all relevant times, Defendants impliedly warranted to Plaintiff JANICE BRICE, her professional cosmetologist(s), and the public generally that the Products were of merchantable quality and safe and fit for ordinary use in that they were safe to use to chemically straighten/relax hair.

279.   At all relevant times, Defendants impliedly warranted to Plaintiff JANICE BRICE, her professional cosmetologist(s), and the public generally that the Products were of merchantable quality and safe and fit for ordinary use in that the cosmetic benefit of the Products outweighed any potential dangers and/or risks

280.   At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because of their increased risk of uterine cancer, especially when used in the form and manner as provided by Defendants.

281.   At all relevant times, Defendants knew or should have known that the Products were unreasonably dangerous because their safety risks outweighed any cosmetic benefit they may have.

282.   At all relevant times, Defendants knew or should have known that the Products had not been sufficiently and/or adequately tested for safety risks, including risk of uterine cancer.

283.   The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by the ordinary user such as Plaintiff JANICE BRICE, with the ordinary knowledge common to the community as to the Products' characteristics.

284.   The unreasonably dangerous characteristics of the Products were beyond that which would be contemplated by professional cosmetologists, such as Plaintiff JANICE

BRICE's professional cosmetologist(s), with the ordinary knowledge common to the community as to the Products' characteristics.

285.   At all relevant times and at the time the Products left the Defendants' control, the implied warranties made by Defendants were false, misleading, and inaccurate because the Products were not safe to use to chemically straighten/relax hair in that they carried an increased risk of uterine cancer.

286.   At all relevant times and at the time the Products left the Defendants' control, the implied warranties made by Defendants were false, misleading, and inaccurate because the cosmetic benefit of the Products did not outweigh any the dangers and/or risks associated with them.

287.   At all relevant times and at the time the Products left the Defendants' control, the implied warranties made by Defendants were false, misleading, and inaccurate because the Products had not been sufficiently and/or adequately tested regarding their safety risks, including the risk of uterine cancer.

288.   Plaintiff JANICE BRICE relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to the Products.

289.   Plaintiff JANICE BRICE reasonably relied upon the skill and judgment of Defendants as to whether the Products were of merchantable quality and safe and fit for their intended use.

290.   Plaintiff JANICE BRICE's professional cosmetologist(s) relied on Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to the Products.

291.     Plaintiff JANICE BRICE's professional cosmetologist(s) reasonably relied upon the skill and judgment of Defendants as to whether the Products were of merchantable quality and safe and fit for their intended use.

292.     As a result of Plaintiff JANICE BRICE's and/or her professional cosmetologist(s)'s reasonable reliance upon Defendants' implied warranties of merchantability and fitness for the ordinary use and purpose relating to the Products, Plaintiff JANICE BRICE used the Products.

293.     The Products were injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the Products and materials were expected to and did reach users, handlers, and persons coming into contact with said Products without substantial change in the condition in which they were sold.

294.     Defendants herein breached the aforesaid implied warranties, as their Products were not merchantable nor fit for their intended purposes and uses.

295.     Plaintiff JANICE BRICE would not have used the Products and/or, her professional cosmetologist(s) would not have applied the Products, bur for the aforesaid implied warranties.

296.     Plaintiff JANICE BRICE's losses and damages were directly caused by Defendants' breach of the aforementioned implied warranties.

297.     Plaintiff JANICE BRICE's losses and damages arose from a customary, usual, reasonably foreseeable use of the Products by Plaintiff JANICE BRICE.

298.     As a result of the foregoing breaches, Plaintiff JANICE BRICE was caused to suffer serious and dangerous side effects including uterine cancer requiring a hysterectomy, as well as other severe and personal losses which are permanent and lasting in nature, physical pain

and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, fear of redeveloping uterine cancer that may require further surgical intervention, losses and damages.

299.    As a result of the foregoing acts and omissions the Plaintiff JANICE BRICE requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff JANICE BRICE further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

300.    By reason of the foregoing, Plaintiff JANICE BRICE has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

### COUNT V
### AS AGAINST ALL DEFENDANTS
### (FRAUDULENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT)

301.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

302.    Prior to 2022, Defendants knew or should have known that the Products were not safe to use to chemically straighten/relax hair given their increased risk of uterine cancer.

303.    Nevertheless, for many years, Defendants falsely represented in direct-to-consumer marketing, advertisements, and/or on the packaging and/or labeling of the Products that the Products were safe to use to chemically straighten/relax hair and concealed that the Products were associated with an increased risk of uterine cancer.

304.    Prior to 2022, Defendants knew or should have known that the cosmetic benefit of the Products did not outweigh the dangers and risks associated with the Products.

305.    Nevertheless, for many years, Defendants falsely represented in direct-to-consumer marketing, advertisements, and/or on the packaging and/or labeling of the Products that the cosmetic benefit of the Products outweighed the dangers and risks associated with the Products.

306.    Prior to 2022, Defendants knew or should have known that the Products had not been adequately and/or sufficiently tested for safety.

307.    Nevertheless, for many years, Defendants falsely represented in direct-to-consumer marketing, advertisements, and/or on the packaging and/or labeling of the Products that the Products were safe to use to chemically straighten/relax hair and concealed that the Products had not been adequately and/or sufficiently tested for safety.

308.    Defendants' fraudulent representations and/or concealments as identified herein were done with the intent of defrauding and deceiving consumers, including the Plaintiff JANICE BRICE, professional cosmetologists, and the public generally, which evinced a callous, reckless, willful, depraved indifference to the health, safety, and welfare of the Plaintiff JANICE BRICE.

309.    Defendants' fraudulent representations and/or omissions as identified herein were done with the intent of inducing consumers, including the Plaintiff JANICE BRICE, into using the Products to chemically straighten/relax hair, which evinced a callous, reckless, willful, depraved indifference to health, safety, and welfare of the Plaintiff JANICE BRICE.

310.    Defendants' fraudulent representations and/or omissions as identified herein were done with the intent of inducing professional cosmetologists, including Plaintiff JANICE BRICE's professional cosmetologist(s), to recommend and/or use/apply the Products to

chemically straighten/relax hair, which evinced a callous, reckless, willful, depraved indifference to health, safety, and welfare of the Plaintiff JANICE BRICE.

311.    In the 1970's, Plaintiff JANICE BRICE began using the Products to chemically straighten/relax her hair.

312.    Plaintiff JANICE BRICE and/or her professional cosmetologist(s) obtained the information regarding the side effects of the Products from direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products.

313.    Defendants represented to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the Products were safe to use for chemically straightening/relaxing hair.

314.    Defendants concealed from Plaintiff JANICE BRICE and/or her professional cosmetologist(s) by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the Products were associated with an increased risk of uterine cancer.

315.    Defendants concealed from Plaintiff JANICE BRICE and/or her professional cosmetologist(s) by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the Products had not been tested sufficiently and/or adequately for increased safety risks, including the risk of uterine cancer.

316.    In the early 1970's, when Plaintiff JANICE BRICE began using the Products and throughout her use of the Products, Defendants represented to her and/or her professional cosmetologist(s) by way of the direct-to-consumer marketing, advertisements, and/or Products' packaging and/or labeling that the Products were safe to use to chemically straighten/relax hair.

317.     In the early 1970's, when Plaintiff JANICE BRICE began using the Products and throughout her use of the Products, Defendants concealed from her and/or her professional cosmetologist(s) by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the Products were associated with an increased risk of uterine cancer.

318.     In the early 1970's, when Plaintiff JANICE BRICE began using the Products and throughout her use of the Products, Defendants concealed from her and/or her professional cosmetologist(s) by way of direct-to-consumer marketing, advertisements, and/or the Products' packaging and/or labeling that the Products had not been tested sufficiently and/or adequately for increased safety risks.

319.     The aforementioned representations made in the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling of the Products since the early 1970's were fraudulently made in that that Defendants concealed that the Products were associated with an increased risk of uterine cancer despite their knowledge to the contrary.

320.     The aforementioned representations made in the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling of the Products since the early 1970's were fraudulently made in that Defendants concealed that the Products had not been adequately and/or sufficiently tested for safety, including the risk of uterine cancer.

321.     As a result of the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling for the Products, since the 1970's, and particularly as a result of Defendants' fraudulent misrepresentation and concealments contained therein, Plaintiff JANICE BRICE was induced to and did purchase the Products since the early 1970's.

322.     As a result of the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling for the Products, in the early 1970's, and particularly as a result of Defendants' fraudulent misrepresentation and concealments contained therein, Plaintiff JANICE BRICE's professional cosmetologist(s) was induced to and did recommend and/or apply the Products since 1970.

323.     As a result of the direct-to-consumer marketing, advertisements, and/or packaging and/or labeling for the Products since the early 1970's, and particularly as a result of Defendants' fraudulent misrepresentation and concealments contained therein, Plaintiff JANICE BRICE was induced to and did use the Products between early 1970's and 2014/2015 time period.

324.     Had Plaintiff JANICE BRICE's professional cosmetologist(s) been told of the increased risk of uterine cancer associated with the Products, they would not have recommended/applied the Products and/or would have provided Plaintiff with adequate warnings regarding the dangers of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

325.     Had Plaintiff JANICE BRICE's professional cosmetologist(s) been told that the cosmetic benefits of the Products, if any, were outweighed by their safety risks, particularly the risk of uterine cancer, they would not have recommended/applied the Products and/or would have provided Plaintiff with adequate information regarding the safety of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

326.     Had Plaintiff JANICE BRICE's professional cosmetologist(s) been told that the Products had not been sufficient and/or adequately tested for safety risks, including the risk of uterine cancer, they would not have recommended/applied the Products and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing

of the Products so as to allow Plaintiff to make an informed decision regarding her use of the Products.

327.     Had Plaintiff JANICE BRICE been told of the increased risk of uterine cancer associated with the Products, she would not have used the Products and/or suffered uterine cancer requiring a hysterectomy.

328.     Had Plaintiff JANICE BRICE been told that the cosmetic benefits of the Products were outweighed by their safety risks, particularly the risk of uterine cancer, she would not have used the Products and/or suffered uterine cancer requiring a hysterectomy.

329.     Had Plaintiff JANICE BRICE been told of the lack of sufficient and/or appropriate testing of the Products for safety risks, including the risk of uterine cancer, she would not have used the Products and/or suffered uterine cancer requiring a hysterectomy.

330.     Plaintiff JANICE BRICE had no way to determine the truth behind Defendants' misrepresentations and concealments as identified herein, and her reliance upon Defendants' representations and concealments was reasonable.

331.     Plaintiff JANICE BRICE's professional cosmetologist(s) had no way to determine the truth behind Defendants' misrepresentations and concealments as identified herein, and their reliance upon Defendants' representations and concealments was reasonable.

332.     Defendants had sole access to material facts concerning the defective nature of the Products, and, particularly, their increased risk of uterine cancer.

333.     Defendants had sole access to material facts concerning the lack of adequate and appropriate testing regarding the safety of the Products.

334.     At all relevant times, Defendants were under a duty to disclose to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) the defective nature of the Products, including but not limited to the heightened risk of uterine cancer.

335.     At all relevant times, Defendants were under a duty to disclose to Plaintiff JANICE BRICE and/or her professional cosmetologists(s) that the risks of the Products outweighed any cosmetic benefit they may have.

336.     At all relevant times, Defendants were under a duty to disclose to Plaintiff JANICE BRICE and/or her professional cosmetologist(s) that the Products had not been adequately and/or sufficiently tested.

337.     Defendants breached their duties to disclose the Products' serious safety risks to Plaintiff JANICE BRICE, her professional cosmetologist(s), and the public in general.

338.     Defendants could have and should have revealed the truth behind the safety of the Products through various outlets, including direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling for the Products.

339.     Defendants' misrepresentations and concealments concerning the safety of the Products were made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff JANICE BRICE, and her professional cosmetologist(s), into reliance, continued use of the Products, and actions thereon, and to cause them to purchase, recommend, and/or use the Products.

340.     Defendants knew that Plaintiff JANICE BRICE and her professional cosmetologist(s) had no way to determine the truth behind Defendants' misrepresentations and concealments surrounding the Products, as set forth herein.

341.    Plaintiff JANICE BRICE's injuries, losses and damages were proximately caused by Defendants' fraudulent misrepresentations and concealments as set forth herein.

342.    Plaintiff JANICE BRICE's injuries, losses and damages were proximately caused by her reasonable reliance on Defendants' fraudulent misrepresentations and concealments as set forth herein.

343.    Plaintiff JANICE BRICE's injuries, losses and damages were proximately caused by her professional cosmetologist(s)'s reasonable reliance on Defendants' fraudulent misrepresentations and concealments as set forth herein.

344.    As a result of the foregoing acts and omissions, the Plaintiff JANICE BRICE was caused to suffer serious and dangerous side effects including uterine cancer requiring a hysterectomy, as well as other severe and personal losses which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of redeveloping uterine cancer that may require further surgical intervention, losses and damages.

345.    As a result of the foregoing acts and omissions the Plaintiff JANICE BRICE requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff JANICE BRICE is informed and believes and further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

346.    By reason of the foregoing, Plaintiff JANICE BRICE has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**COUNT VI
AS AGAINST ALL DEFENDANTS
(NEGLIGENT MISREPRESENTATION)**

347.    Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

348.    Defendants had a duty to make honest and accurate representations to the Plaintiff, her professional cosmetologist(s), and the public in general regarding the safety of the Products.

349.    At all relevant times, Defendants represented to Plaintiff JANICE BRICE, her professional cosmetologist(s), and the public in general that the Products were safe to use to chemically straighten/relax hair.

350.    The aforementioned representations made by Defendants were, in fact, false because the Products were not safe to use to chemically straighten/relax hair given their increased risk of uterine cancer.

351.    When said representations were made by Defendants, they knew or should have known those representations to be false.

352.    The representations made by Defendants were made to Plaintiff JANICE BRICE between the early 1970's and 2014/2015 through direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products.

353.    As a result of Defendants' representations through direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products, Plaintiff JANICE BRICE was induced to want to use the Products and/or request the use of the Products through her professional cosmetologist(s).

354.    Plaintiff JANICE BRICE's professional cosmetologist(s) obtained the information regarding the side effects of the Products from direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products.

355.    Defendants represented to Plaintiff JANICE BRICE's professional cosmetologist(s) by way of direct-to-consumer marketing, advertisements, and/or the packaging and/or labeling of the Products that the Products were safe to use for chemically straightening/relaxing hair.

356.    In or about the early 1970's, when Plaintiff JANICE BRICE began using the Products and throughout her use of the Products, Defendants represented to her by way of direct-to-consumer marketing, advertisements, and/or the packaging and/or the Products' packaging and/or labeling that the Products were safe to use for chemically straightening/relaxing hair.

357.    When the aforementioned representations were made by Defendants, Defendants were aware of and/or should have been aware that their representations would induce Plaintiff JANICE BRICE and/or her professional cosmetologist(s) to use and/or recommend and/or apply the Products.

358.    When the aforementioned representations were made by Defendants, Defendants were aware of and/or should have been aware that the Products were to be used by Plaintiff JANICE BRICE and/or recommended/applied by Plaintiff's professional cosmetologist(s) in reliance upon their representations regarding the safety of the Products.

359.    At the time the aforementioned representations were made by Defendants and at the time Plaintiff JANICE BRICE used the Products and her professional cosmetologist(s) recommended/applied the Products, Plaintiff JANICE BRICE was unaware of the falsity of said representations and reasonably believed them to be true.

360.    At the time the aforesaid representations were made by the Defendants and at the time Plaintiff JANICE BRICE used the Products and/or her professional cosmetologist(s) recommended/applied the Products, her professional cosmetologist(s) were unaware of the falsity of said representations and reasonably believed them to be true.

361.    In reasonable and foreseeable reliance upon said representations, the Plaintiff JANICE BRICE was induced to and did use the Products.

362.    In reasonable and foreseeable reliance upon said representations, the Plaintiff's professional cosmetologist(s) were induced to and did recommend and/or use/apply the Products.

363.    Defendants failed to exercise ordinary care regarding their representations relating to the safety of the Products, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Defendants negligently misrepresented the Products' safety and/or the weighing of risk between the safety of the Products.

364.    Defendants breached their duty by misrepresenting the Products' serious safety risks to Plaintiff JANICE BRICE, her professional cosmetologist(s), and the public in general.

365.    Had Plaintiff's professional cosmetologist(s) known these representations regarding the safety of the Products to be false, they would not have recommended and/or used/applied the Products to Plaintiff JANICE BRICE.

366.    Had Plaintiff known these representations regarding the safety of the Products to be false, she would not have used the Products.

367.    Defendant's negligent misrepresentations proximately caused Plaintiff's injuries, losses and damages as alleged herein.

368.     As a result of their misrepresentations, the Plaintiff JANICE BRICE was caused to suffer serious and dangerous side effects including uterine cancer requiring hysterectomy, as well as other severe and personal losses which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of redeveloping uterine cancer that may require further surgical intervention.

369.     As a result of the foregoing acts and omissions the Plaintiff JANICE BRICE requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff JANICE BRICE is informed and believes and further alleges that she will in the future be required to obtain further medical and/or hospital care, attention, and services.

370.     By reason of the foregoing, Plaintiff JANICE BRICE has been damaged as against the Defendants in the sum of TEN MILLION DOLLARS ($10,000,000.00).

**COUNT VII**
**(AS AGAINST ALL DEFENDANTS)**
**Violation of District of Columbia Consumer Protection Procedures Act**

371.     Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

372.     Janice Kerns Brice was a "consumer" as defined by D.C. Code § 28-3901(a)(2)(A) and Defendants are each "person[s]" as defined by D.C. Code § 28-3901(a)(1) and each of these Defendants is a "merchant" as defined by D.C. Code § 28-3901(a)(3).

373.    The transactions involving Janice Kerns Brice and Defendants constitute consumer goods and services, and were made in connection with and/or while conducting a trade or commerce, within the meaning of D.C. Code § 28-3901(a)(6) and (7).

374.    The Defendants were under a duty to exercise reasonable care in the branding, promotion, and marketing of their Products.

375.    By the conduct described in detail above and incorporated herein, Defendants engaged in unfair or deceptive acts in violation of the District of Columbia Consumer Protection Procedures Act.

376.    Plaintiff purchased and used Defendants' Products primarily for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

377.    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for Defendants' product, and would not have incurred related losses and damages.

378.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, monetary gain from Plaintiff for the Products that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

379.    Defendants engaged in unfair methods of competition and deceptive acts or practices that were proscribed by law, including the following:

a.    Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

b.    Advertising goods or services with the intent to sell them as advertised; and

c.      Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

380.    Defendants intended for Plaintiff to rely on their representations and advertisements regarding the Products in order to achieve monetary gain from Plaintiff through her purchase of the Products.

381.    Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at Plaintiff and other consumers was to create demand for and sell the Products. Each aspect of Defendants' conduct combined to create sales of the product.

382.    Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

383.    Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the product, and would not have incurred related losses and damages.

384.    Defendants' intentional, deceptive, unconscionable, and fraudulent representations and material omissions to consumers, including the Plaintiff Janice Kerns Brice constituted unfair and deceptive acts and trade practices in violation of the District of Columbia Consumer Protection Procedures Act.

385.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of the District of Columbia Consumer Protection Procedures Act.

386.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices, or have made false representations in violation of the District of Columbia Consumer Protection Procedures Act.

387.    Under the District of Columbia Consumer Protection Procedures Act, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

388.     Defendants violated the statutes that were enacted in the District of Columbia to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that Defendants' Products were fit to be used for the purpose for which it was intended, when in fact it was defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

389.    The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statues enacted in the District of Columbia to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

390.    Defendants had actual knowledge or should have had knowledge of the defective and dangerous condition of Defendants' product and failed to take any action to cure such defective and dangerous conditions.

391.    Plaintiff Janice Kerns Brice relied upon Defendants' misrepresentations and omissions in determining which product to use.

392.    Defendants' deceptive, unconscionable or fraudulent representations and material omissions to Plaintiff and other consumers constituted deceptive acts and practices.

393.     By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff, suffered ascertainable losses and damages.

394.     As a direct and proximate result of Defendants' violations of the District of Columbia Consumer Protection Procedures Act Plaintiff sustained losses and damages.

395.     The misrepresentations and omissions of the Defendants, in violation of the D.C. Consumer Protection Procedures Act, proximately caused plaintiff's losses, and the Defendants are liable for all damages flowing therefrom, pursuant to D.C. Code § 28-3905(k).

396.     WHEREFORE, plaintiff Janice Kerns Brice, demands judgment against the Defendants, jointly and severally, in the amount of THIRTY MILLION DOLLARS ($30,000,000.00) compensatory damages pursuant to the treble damage provision of § 28-3905(k)(1)(A), TWENTY MILLION DOLLARS  ($20,000,000.00) punitive damages pursuant to the provision of § 28-3905(k)(1)(C), reasonable attorney's fees, costs, and any other relief that this court deems proper.

## COUNT VIII
## (LOSS OF CONSORTIUM)

397.     Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

398.     Plaintiff, Frank Kerns, was at all relevant times, and is, the lawful spouse of Plaintiff Janice Kerns Brice, and as such, was and is entitled to the comfort, enjoyment, society, and services of her spouse.

399.     As a direct and proximate result of the foregoing, Plaintiff Frank Kerns was deprived of the comfort and enjoyment of the services and society of his spouse, Plaintiff Janice

Brice, has suffered and will continue to suffer economic loss, and has otherwise been emotionally and economically injured.

400.    Plaintiff Frank Kerns' losses and damages are permanent and will continue into the future. Plaintiffs seek actual and punitive damages from the Defendants as alleged herein.

401.    By reason of the foregoing, each Plaintiff has been damaged as against the Defendants in excess of seventy-five thousand dollars ($75,000.00).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages in excess of $75,000 to Plaintiff for past and future damages, including, but not limited to, pain and suffering for severe and permanent personal losses, emotional distress, loss of enjoyment of life, and other non-economic damages sustained by the Plaintiff JANICE BRICE, health care costs, together with interest and costs as provided by law;

2.    Punitive and/or exemplary damages as allowed for by law for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3.    Damages allowed by law under the DC Consumer Protection and Procedure Act;

4.    Awarding Plaintiff prejudgment interest, post judgement interest, reasonable attorneys' fees;

5.    Awarding Plaintiff the costs of these proceedings; and

6.    Such other and further relief as this Court deems just and proper.

Dated: February 16, 2023                    Respectfully submitted,

                                            **THE COCHRAN FIRM**


                                            Karen E. Evans, Esq.  #426067
                                            1666 K Street, N.W., Suite 1150
                                            Washington, D.C. 20006
                                            202-682-5800 – Phone
                                            202-408-8851 – Fax
                                            kevans@cochranfirm.com



                                            David E. Haynes, Esq. #483119
                                            1666 K Street, N.W., Suite 1150
                                            Washington, D.C. 20006
                                            202-682-5800 – Phone
                                            202-408-8851 – Fax
                                            dhaynes@cochranfirm.com